UNITED STATES of America,
Appellee,

v.

John R. PARK, Appellant.

No. 73–1953.

United States Court of Appeals,
Fourth Circuit.

Argued Nov. 7, 1973.

Decided July 2, 1974.

Gregory M. Harvey, Philadelphia, Pa. (J. Cookman Boyd, Jr., Rob Ross Hendrickson, Baltimore, Md., on brief), for appellant.

Leonard M. Linton, Jr., Asst. U. S. Atty. (George Beall, U. S. Atty., on brief), for appellee.

Before BOREMAN, Senior Circuit Judge, and CRAVEN and FIELD, Circuit Judges.

BOREMAN, Senior Circuit Judge:

John R. Park, President of Acme Markets, Inc. (hereafter Acme), was tried and convicted by a jury of violating 21 U.S.C. § 331(k)—causing the adulteration of food which had traveled in interstate commerce and which was held for sale.[1] The evidence is undisputed that an inspector of the Food and Drug Administration (F.D.A.) made an inspection of Acme's Baltimore warehouse in November and December of 1971 and again in March of 1972. On both of these occasions the inspector found evidence of rodent infestation of food stored in the warehouse. As a result of these inspections an informal hearing was held in June 1972 at the F.D.A.'s Baltimore office. Although Park was not present, he was invited to attend the hearing and was represented by Robert W. McCahan, Baltimore Divisional Vice President of Acme.

In March of 1973, a five-count information was filed charging Acme *and* Park with the offenses cited above; four counts stemmed from the 1971 inspection and the fifth count from the 1972 inspection. Prior to trial Acme pleaded guilty to all counts. Park was tried on the theory that he "was a corporate officer who, under law, bore a relationship to the receipt and storage of food which would subject him to criminal liability under United States v. Dotterweich, 320 U.S. 277 [64 S.Ct. 134, 88 L.Ed. 48] (1943)." The jury found Park guilty on all counts and he was fined a total of $250.[2]

Park appeals his conviction alleging (1) the court erred in its instructions to the jury and (2) prejudicial evidence of warnings of alleged prior violations of the Act was improperly admitted.

The court charged the jury that the sole question was "whether the Defendant held a position of authority and responsibility in the business of Acme Markets"; that Park could be found guilty "even if he did not consciously do wrong" and even though he had not "personally participated in the situation" if it were proved beyond a reasonable doubt that Park "had a responsible relation to the situation." We conclude that this charge does not correctly state the law of the case, that the conviction of Park on all counts must be reversed and a new trial awarded.

---

1. 21 U.S.C. § 331 provides, in part:
 The following acts and the causing thereof are prohibited:

 • • • • •

 (k) The alteration, mutilation, destruction, obliteration, or removal of the whole or any part of the labeling of, or the doing of any other act with respect to, a food, drug, device, or cosmetic, if such act is done while such article is held for sale (whether or not the first sale) after shipment in interstate commerce and results in such article being adulterated or misbranded.

 • • • • •

2. Park stated that a controlling factor in his decision to appeal this conviction was the fact that a second conviction under 21 U.S.C. § 331 is a felony, punishable by a term of imprisonment up to three years. Although violations of food and drug laws are punishable without regard to proof of scienter, the Supreme Court has indicated that it is an open question whether, in the absence of proof of scienter, an accused could be *incarcerated* for violating a "regulatory" statute. Morissette v. United States, 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288 (1952); *see also* United States v. International Minerals & Chemical Corp., 402 U.S. 558, 564, 91 S.Ct. 1697, 29 L.Ed.2d 178 (1971). We note that due process standards with respect to the loss of liberty appear to be higher than those with respect to loss of property. *Cf.* Argersinger v. Hamlin, 407 U.S. 25, 92 S.Ct. 2006, 32 L.Ed.2d 530 (1972). We, too, consider this to be an open question and intimate no opinion on it.

The Government asserts that this case is controlled by the decision of the Supreme Court in United States v. Dotterweich, 320 U.S. 277, 64 S.Ct. 134, 88 L. Ed. 48 (1943),[3] and contends that *Dotterweich* specifically held that the Federal Food, Drug, and Cosmetic Act (Act), 21 U.S.C. §§ 301–392, "dispenses with the conventional requirement for criminal conduct—awareness of some wrongdoing." 320 U.S. at 281, 64 S.Ct. at 136. From this the Government argues that the conviction may be predicated solely upon a showing that the defendant, Park, was the President of the offending corporation. The error here is that the Government has confused the element of "awareness of wrongdoing" with the element of "wrongful action";[4] *Dotterweich* dispenses with the need to prove the first of those elements but not the second.

■■ As a general proposition, some act of commission or omission is an essential element of every crime. For an accused individual to be convicted it must be proved that he was in some way personally responsible for the act constituting the crime. The Supreme Court recognized this in *Dotterweich*: "The

offense is committed . . . by all who do have such a responsible share in the furtherance of the transaction which the statute outlaws . . . ." 320 U.S. at 284. The criminal acts which were the subject of Acme's conviction cannot be charged to Park without proof that he participated directly or constructively therein or that the acts were done to further some criminal conspiracy in which he took part.[5] To use the language of *Dotterweich*, "under § 301 [21 U.S.C. § 331] a corporation may commit an offense and all persons who *aid and abet* its commission are equally guilty." 320 U.S. 284, 64 S.Ct. at 138 (emphasis added). It is the defendant's relation to the criminal acts, not merely his relation to the corporation, which the jury must consider; 21 U.S.C. § 331 is concerned with criminal conduct and not proprietary relationships.

■■ In sum, the court told the jury that Park would be guilty if it were shown that he "had a position of authority and responsiblity in the situation out of which these charges arose." This instruction, taken in combination with the other parts of the charge related above, might well have left the jury with the

---

3. As *Dotterweich* was postured when it reached the Supreme Court the primary question was whether "only the corporation was the 'person' subject to prosecution" under the Act. Therefore, the Supreme Court's opinion reveals very little about the factual setting in that case. Mr. Dotterweich was President and General Manager of Buffalo Pharmacal Company, Inc. The company was small, employing only twenty-six employees, all of whom worked on one upper floor of the building. Mr. Dotterweich was responsible for "general overseeing" of the Company operations; he was the direct supervisor of all employees. The trial transcript establishes that Mr. Dotterweich personally made every executive decision and had direct personal supervisory responsibility over the physical acts which resulted in the interstate shipment of misbranded and adulterated drugs. In the instant case Park is the chief executive officer of Acme, a multistate corporate giant. *See* note 5, *infra*. It is clear that his supervisory responsibility over most of the employees is indirect. There is no allegation or proof that Park was responsible for the executive deci-

sions which resulted in contamination of the food. The facts of *Dotterweich* established the personal responsibility which we find lacking in the case before us.

4. The Federal Food, Drug, and Cosmetic Act § 331(k) prohibits "causing" the adulteration of food which has traveled in interstate commerce and is held for sale. We would define "wrongful action" in this context as acts of the accused which *cause* the adulteration of such food.

5. Acme maintained its principal corporate offices and headquarters in Philadelphia, Pennsylvania. As president, Park also maintained principal executive offices there. As Acme's president and chief executive officer, Park was theoretically in charge of approximately 36,000 employees in 874 retail outlets, 12 main warehouses and 4 special warehouses located on the east and west coasts of the United States. To hold Park *criminally* liable for the wrongful actions of each and every one of these employees by merely showing his position with the corporation is manifestly unjust, unfair and beyond the realm of reasonableness.

erroneous impression that Park could be found guilty in the absence of "wrongful action" on his part.

 Upon a subsequent trial the jury should be instructed that a finding of guilt must. be predicated upon some wrongful action by Park. That action may be gross negligence and inattention in discharging his corporate duties and obligations or any of a host of other acts of commission or omission which would "cause" [6] the contamination of the food.[7] "Whether an accused shares responsibility in the business process resulting in unlawful distribution depends on the evidence produced at the trial and its submission—assuming the evidence warrants it—to the jury under appropriate guidance." *Dotterweich, supra,* 320 U.S. at 284, 64 S.Ct. at 138.

It is argued by the prosecution that the requirement of such proof will make enforcement more difficult. Nevertheless, the requirements of due process are intended to favor fairness and justice over ease of enforcement. We perceive nothing harsh about requiring proof of personal wrongdoing before sanctioning the imposition of criminal penalties.

 We find another ground for reversal of Park's conviction. He contends that the admission in evidence of a warning by F.D.A. as to conditions alleged to have existed in 1970 in Acme's Philadelphia warehouse was prejudicial error requiring reversal. There was no evidence of prosecution of either Acme or Park following F.D.A.'s warning. In the recent case of United States v. Woods, 484 F.2d 127 (4 Cir. 1973), this court examined in detail the admissibility of evidence relating to prior alleged offenses *not the subject of conviction* and we will not attempt to elaborate here.[8]

The *Woods* majority adopted a modern and liberal approach concerning the admissibility of such evidence. This court refused to decide the issue by "pigeonholing" the evidence under one of a number of recognized exceptions to the general rule that such evidence is inadmissible. Opting for a more flexible balancing test the court cited McCormick on Evidence § 190, p. 453 (Cleary Ed.1972).

"[T]he problem is not merely one of pigeonholing, but one of balancing, on the one side, the actual *need* for the other crimes evidence *in the light of the issues* and the other evidence available to the prosecution, the convincingness of the evidence that the other crimes were committed and that the accused was the actor, and the strength or weakness of the other crimes evidence in supporting the issue, and on the other, the degree to which the jury will probably be roused by the evidence to overmastering hostility." United States v. Woods, 484 F.2d 127, 134 (4 Cir. 1973) (emphasis added).

In determining the admissibility of "prior crimes" evidence the *Woods* majority balanced the relevancy, persuasiveness and *need* for such evidence against the prejudice resulting to the defendant because of its admission. In a dissenting opinion in *Woods* Judge Widener favored the application of a

---

6. See note 4, *supra.*

7. It would appear that the question of causation will be a principal issue upon a retrial. The question of causation is to be distinguished from that of intent. United States v. Sheridan, 329 U.S. 379, 67 S.Ct. 332, 91 L.Ed. 359 (1946). Some guidance with respect to the question of causation can be found in cases construing "aid and abet" which phrase appears in United States v. Dotterweich, 320 U.S. 277, 284, 64 S.Ct. 134, 88 L.Ed. 48 (1943). *See also* United States v. Peoni, 100 F.2d 401 (2 Cir. 1938).

8. In the case of United States v. Woods, *supra,* the defendant was convicted of first-degree murder of an eight-month-old infant. At trial evidence that other children in defendant's care had died or suffered respiratory difficulties was admitted to prove the commission of the crime charged. On appeal this court held that the evidence was admissible in general and also admissible to prove corpus delicti. Although *Woods* was decided in a completely different factual setting, the legal principles enunciated therein are clearly applicable to the present case.

traditional and less liberal balancing test.[9] Regardless of the balancing test applied, we are convinced that the evidence concerning the Philadelphia incident was inadmissible under the theory on which the case was tried.

Initially we conclude that there was no actual need for the Philadelphia evidence. In his jury charge the district judge stated that:

> "[Y]ou need not concern yourselves with the first two elements of the case. The main issue for your determination is only with the third element, whether the Defendant held a position of authority and responsibility in the business of Acme Markets."

Thus, as this case was submitted to the jury and in light of the sole issue presented, *need* for the Philadelphia evidence is not apparent. Absent a showing of such need we are of the opinion that, even under the liberal balancing test of *Woods*, the prejudicial effect of this evidence outweighed any possible relevancy or persuasiveness it might have had.[10]

We note in passing, without deciding, that in light of our comments above evidence of "prior crimes" might become sufficiently necessary and relevant to warrant its admission on retrial. Our conclusion that the prosecution must show some wrongful act by the accused may affect the result of the balancing test as prescribed in *Woods* by increasing the *need* for "prior crimes" evidence. Whether the need for and the persuasiveness and relevance of such evidence may outweigh its prejudicial effect will, in large part, depend on the prosecution's new approach to the presentation of its case. Thus, on retrial, it will be incumbent upon the district court to determine the admissibility of this "prior crime" evidence in light of developments.

Reversed and remanded for a new trial.

CRAVEN, Circuit Judge (dissenting):

I would affirm because I believe this case is controlled by United States v. Dotterweich, 320 U.S. 277, 64 S.Ct. 134, 88 L.Ed. 48 (1943). To express my viewpoint, it is enough to quote from Mr. Justice Frankfurter writing for the Court in *Dotterweich*:

> The Food and Drugs Act of 1906 was an exertion by Congress of its power to keep impure and adulterated food and drugs out of the channels of commerce. By the Act of 1938, Congress extended the range of its control over illicit and noxious articles and stiffened the penalties for disobedience. The purposes of this legislation thus touch phases of the lives and health of people which, in the circumstances of modern industrialism, are largely beyond self-protection. Regard for these purposes should infuse construction of the legislation if it is to be treated as a working instrument of government and not merely as a collection of English words. . . .
> The prosecution to which Dotterweich was subjected is based on a now fa-

---

9. In applying a balancing test, the considerations confronting the district court may be summarized succinctly: assuming an exception to the rule is applicable, before admitting evidence of prior acts of crimes, the court should determine, first, whether the evidence is relevant; secondly, whether the evidence is unduly prejudicial notwithstanding its relevancy; and, thirdly, having met both prior tests, whether the evidence is truly needed by the prosecution.

United States v. Woods, 484 F.2d 127, 141 (4 Cir. 1973) (Widener, J., dissenting opinion).

10. Such a conclusion is consistent with the result reached in *Woods*. Throughout the opinion in *Woods* the court emphasized the overriding *need* for "prior crimes" evidence because of the particular and peculiar nature of infanticide cases.

> Indeed, the evidence is so persuasive and *so necessary* in case of infanticide . . . if the wrongdoer is to be apprehended, that we think that its relevance clearly outweighs its prejudicial effect on the jury.

United States v. Woods, 484 F.2d 127, 135 (4 Cir. 1973) (emphasis added).

miliar type of legislation whereby penalties serve as effective means of regulation. Such legislation dispenses with the conventional requirement for criminal conduct—awareness of some wrongdoing. In the interest of the larger good it puts the burden of acting at hazard upon a person otherwise innocent but standing in responsible relation to a public danger. . . . And so it is clear that shipments like those now in issue are "punished by the statute if the article is misbranded [or adulterated], and that the article may be misbranded [or adulterated] without any conscious fraud at all. . . ."

*Id.* at 280–281, 64 S.Ct. at 138 (citations omitted).

In *Dotterweich* the Supreme Court reversed a Second Circuit decision that was said to be motivated by "fear that an enforcement of § 301(a) as written might operate too harshly by sweeping within its condemnation any person however remotely entangled in the proscribed shipment." 320 U.S. at 284, 64 S.Ct. at 138. But defendant Park was not just "remotely entangled" in the proscribed adulteration. Like Dotterweich, he was president of the corporation with full power to control its operations and to take measures to prevent rat infestation of food. Although he had delegated the day-to-day supervision of sanitation to subordinates, Park retained both the power and responsibility to see that the system of rodent control was effective, and if it didn't work, to change it.

As Mr. Justice Frankfurter said about Dotterweich:

The offense is committed . . . by all who . . . have such a responsible share in the furtherance of the transaction which the statute outlaws, namely, to put into the stream of interstate commerce adulterated or misbranded drugs [or food]. Hardship there doubtless may be under a statute which thus penalizes the transaction though consciousness of wrongdoing be totally wanting. Balancing relative hardships, Congress has preferred to place it upon those who have at least the opportunity of informing themselves of the existence of conditions imposed for the protection of consumers before sharing in illicit commerce, rather than to throw the hazard on the innocent public who are wholly helpless.

*Id.* at 284–285, 64 S.Ct. at 138.

The trial judge made it perfectly clear to the jury that "the fact that the Defendant is present and is a chief executive officer of the Acme Markets does not require a finding of guilt. Though, he need not have personally participated in the situation, he must have had a responsible relationship to the issue. The issue is, in this case, whether the defendant, John R. Park, by virtue of his position in the company, had a position of authority and responsibility in the situation out of which these charges arose."

Thus, again in the language of Mr. Justice Frankfurter, "the District Court properly left the question of the responsibility of [Park] for the shipment to the jury, and there was sufficient evidence to support its verdict." 320 U.S. at 285, 64 S.Ct. at 138.

Moreover it is clear from examining the prosecutor's argument to the jury that there was no effort to equate the presidency of the corporation with the responsibility. Instead, the government argued that Mr. Park was responsible because he had established a system of rodent control that did not work in March 1970, November 1971 and March 1972 and that even so he made no effort to change or improve the system.[1] The government's contention was not that the jury should convict if they found

---

1. Park's testimony indicated the system was established before he became president, but he conceded that if it didn't work, and needed changing, it was his responsibility to change it. In addition, Park acknowledged having received a letter from the FDA in 1970 outlining unsanitary conditions an inspection team had found in the Philadelphia warehouse.

that Mr. Park was president (that was undisputed) but that they should convict if they found it to be his responsibility for setting up a system of sanitation and of delegating responsibility in a way that does the job in a sanitary way.

I am sympathetic with my brothers' sense of justice that prompts them, it seems to me, to write into the statute some small degree of mens rea or scienter as a prerequisite to liability, but I share the government's fear that today's decision will undermine the congressional purpose of protecting "the innocent public who are wholly helpless" to protect themselves from contaminated food.

Because there will be a new trial, I want to align myself with the majority's suggestion that evidence in the nature of "prior offenses" may be admissible. Indeed, I would go further. If an additional burden of proof is to be put upon the government to show that Mr. Park acted wrongfully, then it would seem to me that evidence would clearly be admissible that Park's system of rodent control did not work in March 1970 in Philadelphia, or in November 1971 or March 1972 in Baltimore. If the rule is otherwise, I think the government cannot possibly sustain its new burden.