**UNITED STATES of America,**
**Appellant,**

v.

**ABBOTT LABORATORIES, a corporation, et al., Appellees.**

**No. 74–1230.**

United States Court of Appeals,
Fourth Circuit.

Argued June 4, 1974.

Decided Oct. 2, 1974.

Certiorari Denied March 24, 1975.
See 95 S.Ct. 1424.

Howard E. Shapiro, Atty., U. S. Dept. of Justice (Thomas E. Kauper, Asst. Atty. Gen., and Roger B. Andewelt, Atty., U. S. Dept. of Justice on brief), for appellant.

George M. Burditt, Chicago, Ill., for Abbott Laboratories and Thomas F. Ellis, Raleigh, N. C., for Herbert M. Gross (James R. Phelps and Burditt & Calkins, Chicago, Ill., and James C. Little and Hatch, Little, Bunn, Jones, Few & Berry, Raleigh, N. C., on brief), for appellee Abbott Laboratories; (Maupin, Taylor & Ellis, Raleigh, N. C., on brief), for appellee Herbert M. Gross.

Lucas, Rand, Rose, Meyer, Jones & Orcutt and Louis B. Meyer, Wilson, N. C., on brief for appellee Clarence J. Endicott.

Lindsay C. Warren, Jr., John H. Kerr, III, and Taylor, Allen, Warren & Kerr, Goldsboro, N. C., on brief for appellee Robert T. O'Donnell.

C. Kitchin Josey and Josey & Vaughan, Scotland Neck, N. C., on brief for appellee Robert H. Otto.

John R. Jolly, Jr., and Spruill, Trotter & Lane, Rocky Mount, N. C., on brief for appellee Harry Howell.

Before WINTER, BUTZNER and WIDENER, Circuit Judges.

WINTER, Circuit Judge:

The government appeals from the district court's dismissal of a sixty-count indictment charging Abbott Laboratories (Abbott) and five of its current or former employees with causing the introduction into interstate commerce of adulterated and misbranded intravenous solution drugs in violation of 21 U.S.C. § 331(a). The district court dismissed the indictment (1) because of prejudicial pretrial publicity released by the special prosecutor in answer to an inquiry by a newspaper reporter, prejudicial publicity contained in a press re-

lease originating from the Department of Justice, and prejudicial publicity contained in another press release originating from the Food and Drug Administration (FDA), and (2) because the grand jury which returned the indictment, at the instance of Department of Justice attorneys, considered "prejudicial and inflammatory" information not relevant to its inquiry, which caused it to be biased in derogation of the constitutional rights of the defendants. We think that under the facts of the case, dismissal of the indictment was too drastic a remedy for what misconduct on the part of the government occurred and that the challenged evidence considered by the grand jury was relevant to its investigation and proper to be considered by it. We reverse and remand the case for further proceedings.

I.

In December, 1970, the Center for Disease Control (CDC) of the United States Public Health Service investigated an increase in the incidence of blood poisoning among hospital patients. CDC concluded that between October, 1970, and March 1, 1971, one hundred fifty cases of blood poisoning and nine deaths had occurred in eight hospitals among patients who had received intravenous fluid therapy employing intravenous fluids and intravenous fluid systems manufactured by Abbott. CDC investigators found bacterial contamination of the cap liner in unopened Abbott bottles of intravenous solutions, and they postulated that "the organisms can enter the fluid from the plastic cap liners when the caps are opened and replaced while the bottle is held for later use." The report of these findings received national media coverage describing the illnesses and deaths and isolation of the "guilty germ" in the cap liner of Abbott bottles. On March 22, 1971, Abbott issued a nationwide recall of its intravenous solutions.

FDA recommended to the Department of Justice that Abbott and those of its employees "responsible" for distribution of the allegedly contaminated intravenous solutions be prosecuted. The matter was presented to a grand jury in a district in which Abbott manufactures intravenous solutions, and the indictment was returned on May 29, 1973.

A. Post-indictment Publicity.

As soon as the indictment was returned, the United States Attorney for the Eastern District of North Carolina notified the news media that he had a press release concerning the indictment. The news department of a Raleigh television station requested an interview with him. The request was granted and the interview held at about 2:00 p. m. in his office. Two special prosecutors from the Justice Department and an attorney from FDA were also present. The interview was conducted in three stages by a television newswoman from the local station. There was first an off-camera interrogation of the government attorneys by the correspondent. Then there was a taped interview of the U. S. Attorney, at which he answered questions that had been submitted in advance. After the taping session, the correspondent continued to interrogate the attorneys for a time.

During the pretaping interrogation, the correspondent asked whether any deaths or illnesses were attributed to the misbranded drugs. One of the special prosecutors replied that "the Center for Disease Control in Atlanta previously reported that nine deaths occurred in 1971." During the subsequent taping session, the correspondent asked the same question of the U. S. Attorney. Not expecting this question to be asked, he replied that the indictment had nothing to do with any deaths. Following the taped interview, the correspondent continued to ask questions concerning deaths attributable to Abbott's intravenous solution. The answers, in substance, provided the same information as the answer quoted above.

On the six o'clock news that day, the Raleigh TV station broadcast a news re-

port concerning the indictment, which contained the following statements:

Nine deaths and four hundred illnesses have been attributed to contaminated drugs made by a North Carolina company.

. . . the drugs were manufactured by the Abbott Laboratories Hospital Products Division of Rocky Mount.

The taped interview was also broadcast on this program, but the U. S. Attorney's statement that the indictment had nothing to do with any deaths was omitted.

On the same day, United Press International (UPI) ran a story citing sources in the Justice Department in Washington, containing the following statement:

A federal grand jury has returned criminal indictments against Abbott Laboratories, Inc. and five of its present or former employees on charges involving allegedly contaminated intravenous fluid linked to nine deaths and hundreds of injuries, the Justice Department announced Tuesday.

The circumstances make it clear that the remarks of those present at the interview in the U. S. Attorney's office in Raleigh were *not* the source of this news release. Nothing further is apparently known about the actual source of this release than that which appears on its face. This UPI release received the wide publication that could be expected in the case of a wire service of this type.

On May 29, 1973, some hours after the indictment was handed down, the FDA issued a press release in Washington, D. C., containing the following statements:

Five present or former officials of the company also were named in the indictment for interstate shipment of intravenous drugs that were unsterile and dangerous to public health.

The Center for Disease Control, at Atlanta, Georgia, reported fifty deaths from four hundred and twelve patient episodes during late 1970 and early 1971 from septicemias (blood poisonings) which CDC determined to be associated with the use of contaminated Abbott intravenous solutions.

These individuals held positions of responsibility with respect to the adulteration and misbranding for the intravenous drugs named in the indictment.

Both the UPI "nine deaths" release and the FDA "fifty deaths" release received wide coverage throughout the nation in the television, radio and printed media at the time of the indictment. The "nine deaths" story arising out of the interview with the U. S. Attorney reached the viewers of WRAL–TV of Raleigh, North Carolina, who are spread throughout many of the counties of the Eastern District of North Carolina.

**B. Proceedings Before the Grand Jury.**

The proof shows that the death or possible death of persons who had received Abbott's intravenous solutions was mentioned before the grand jury in three separate instances. The first was during the examination of preliminary witnesses, and the last was during the prosecutor's discussion of the recommended indictment. No transcript for these instances is in the record or available, and further details cannot be stated.

The second instance was during the interrogation of Robert O'Donnell, Abbott's Director of Quality Assurance, who was named as a defendant in the indictment subsequently returned. Mr. O'Donnell was questioned about an investigation conducted by Abbott in a Detroit hospital which purportedly exculpated Abbott or seriously questioned the findings of CDC. He was asked if that hospital had "had a couple of dead bodies . . . from Abbott I. V. solu-

tions," and O'Donnell said that he could not recall. He was then questioned about certain Detroit newspaper accounts concerning hospital deaths resulting from tainted bottle caps, in an effort to refresh his recollection. Finally, he was asked if his investigator had said that the Detroit newspaper was "crazy as bedbugs" when it reported deaths in Detroit from the use of Abbott solutions. Mr. O'Donnell denied the statement by the investigator.

## C. Proceedings in the District Court.

Defendants sought dismissal of the indictment by two motions. On July 13, 1973, they moved to dismiss the indictment on the grounds that the prejudicial publicity engendered by the "nine deaths" story arising out of the WRAL–TV interview with the prosecutor and, independently, out of the UPI release in Washington, and by the FDA's "fifty deaths" release prevented the defendants from receiving a fair trial. On October 3, 1973, the defendants moved that the indictment be dismissed on the ground that the statements made by the special prosecutor before the grand jury concerning the deaths allegedly caused by Abbott's intravenous solutions were highly prejudicial and deliberately inflammatory. At the hearing, numerous affidavits, exhibits and memoranda were submitted on both motions. On December 13, 1973, the district court entered an order dismissing the indictment as to all defendants both on the ground that prejudicial publicity precluded a fair trial and on the ground that prosecutorial misconduct before the grand jury invalidated the indictment. In its accompanying memorandum, the district court made the following findings in support of its dismissal of the indictment because of prejudicial pretrial publicity:

(1) That defendants had demonstrated that the "nine deaths" and "fifty deaths" stories had sufficiently infected the community so that voir dire could not be used to guarantee the defendants' constitutional right to a fair trial.

(2) That a continuance would not protect defendants' right to a fair trial because of the likely recurrent nature of the prejudicial publicity—i. e., the "nine deaths" and "fifty deaths" stories would be continually resurrected at each point at which the case was brought on for trial—and because a continuance to remedy the effect of pretrial publicity caused by the prosecutors would prejudice defendants' constitutional right to a speedy trial.

(3) That a change of venue would not protect defendants' right to a fair trial because the government failed to suggest any district in the United States to which the trial could be transferred which had not been infected with the prejudicial publicity.

Throughout, the defendants have maintained that the "nine deaths" and "fifty deaths" stories were false and prejudicial. They claim that it cannot be established that any septicemia deaths were caused by microorganisms that were contained in the cap liners of Abbott's intravenous solutions when they left the Rocky Mount, North Carolina, plant. They further assert that even if these charges were true, evidence that the intravenous solutions in question had caused septicemia deaths would be inadmissible in a trial upon the charge of distributing adulterated and misbranded drugs in interstate commerce. The district court made no finding of whether the charges in the "nine deaths" and "fifty deaths" stories were true.

## II.

We accept, without question, that the pretrial publicity in this case was prejudicial and highly inflammatory. The "nine deaths" and "fifty deaths" stories could unquestionably be expected to have a substantial adverse effect on the impartiality of many persons in the community from which a jury to try defendants would be drawn. And the case is not made easier by the fact that, even if not intentionally inflammatory, the "fifty deaths" story appears to have been a

deliberate, conscious statement by FDA, and the "nine deaths" story a conscious, deliberate statement of the Department of Justice in Washington, although probably an inadvertent one by the prosecutors in North Carolina. Irrespective of the outcome of this case, we join in the district court's condemnation of this conduct and express our strongest disapproval that highly placed legal officers would make a statement of this import with regard to a pending criminal prosecution, and even more so that FDA, which had referred the matter to the Department of Justice, would issue a press release containing such prejudicial material. We are presented, however, with the question of whether this misconduct on the part of the government was so prejudicial to the defendants' right to a fair trial that it should be redressed by dismissal of the indictment with the consequent effect that the interests of society in enforcement of the law should be terminated before the guilty or innocence of the defendants has been determined. What disciplinary action should be taken in this or any future case against responsible government employees or officials for the patent threat to defendants' right to a fair trial is not a question before us, although it may subsequently become the subject of separate proceedings.

No case of which we are aware, nor any to which we have been referred, holds that, without resort to the traditional means of effective protection of a defendant's right to a fair trial, i. e., voir dire, change of venue, continuance, pretrial publicity has been so inflammatory and prejudicial that a fair trial is absolutely precluded and an indictment should be dismissed without an initial attempt, by the use of one or more of the procedures mentioned, to see if an impartial jury can be impanelled. In Wansley v. Slayton, 487 F.2d 90 (4 Cir. 1973), we expressed confidence in the efficacy of voir dire examination as a protection against prejudicial publicity. There we concluded that the combination of (1) a lapse of time between prejudi-

cial publicity and trial, and (2) an extensive and skillful voir dire examination of jurors was sufficient to overcome the prejudice created when a black defendant charged with raping three white women was given widespread, intensive prejudicial pretrial publicity, including a report that he had confessed to the authorities and had retraced his trail of crime. Of course in the instant case, the factor of governmental misconduct in initiating prejudicial pretrial publicity is greater than it was in *Wansley*; but this is a distinction, for present purposes, largely without a difference, since the outcome of the case, as we see it, depends upon whether fairness to defendants may still be accomplished and not whether misconduct of the government warrants punishment which also forfeits the rights of society. United States v. Milanovich, 303 F.2d 626 (4 Cir. 1962), cert. den., 371 U.S. 876, 83 S.Ct. 145, 9 L.Ed.2d 115 (1962).

Rideau v. Louisiana, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963), suggest that pretrial publicity may be so prejudicial that no trial by jury drawn from the *community in which it was dis*-seminated would be constitutionally fair, and thus that the prosecution should be quashed if a change of venue to an unpolluted community is not possible. In *Rideau,* it was held that the defendant must be tried by a jury drawn from a community which had not been exposed to telecasts of the defendant's confessing his guilt to the authorities; and the Court reached this result "without pausing to examine a particularized transcript of voir dire examination of the members of the jury" to determine its effectiveness. 373 U.S. at 727, 83 S.Ct. at 1149. Implicit, if not explicit, in *Rideau* is the notion that defendant might obtain a fair trial by a change of venue, and, accordingly, the Court permitted Rideau to be retried and did not require the prosecution to be terminated. Should a case arise where prejudicial pretrial publicity is so widespread and pervasive that a change of venue would be ineffective to assure a defendant a

fair trial, *Rideau* may mean that it is proper to quash a prosecution.

■ Whatever may be the ultimate implications of *Rideau*, we do not think that in this case the district court's finding that voir dire could not be used to guarantee defendants' right to a fair trial can be sustained. The prejudicial publicity in the instant case was not as devastating as the prejudicial publicity in *Rideau*. In *Rideau*, prejudice was committed by pretrial disclosure of the most persuasive evidence of guilt—the defendant's own confession. Here, the prejudice may have affected the purity of the jury's fact-finding process, but it was not direct evidence of guilt, nor even evidence, necessarily admissible at trial. It is not inconceivable that prospective jurors, previously exposed to the publicity, had forgotten it, United States v. Bowe, 360 F.2d 1, 11–12 (2 Cir. 1966); or, remembering it, could truthfully and persuasively answer on voir dire that they would be unaffected in their deliberations by their recollection. See Irvin v. Dowd, 366 U.S. 717, 722–723, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). The district court's concern that the publicity might be revived, and the curative effect of the passage of time between original dissemination and trial dissipated if the case were set for trial, is a valid one. But it does not follow that prospective jurors would necessarily receive a second exposure to the "nine deaths" and "fifty deaths" publicity. Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966), teaches that the district court has wide powers to protect a jury from infection to insure defendants a fair trial, and it is its duty to exercise them to accomplish those results. In sum, we hold that, although in a proper case *Rideau* may not require resort to voir dire and proof of the results thereof as proof essential to a finding that a defendant may not receive a fair trial so as to warrant dismissal of an indictment, such proof is essential in the instant case. Consequently, the district court's finding that a fair trial was impossible and its legal conclusion that the indictment should be dismissed cannot stand, since voir dire was not employed.

■■ Because of what we have concluded with respect to voir dire, elaborate discussion of the curative devices of change of venue and continuance is unnecessary. A few comments, however, are in order. Change of venue is a recognized device to overcome pretrial prejudicial publicity because it is not unreasonable to assume that pretrial publicity may receive less dissemination elsewhere than in the jurisdiction in which charges are lodged, or, even if it receives the same degree of dissemination elsewhere, that its prejudicial effect is less than in the jurisdiction where it has special local interest. In many instances change of venue is resorted to only after voir dire establishes that the inability to obtain a fair trial as a result of pretrial publicity exists. Wright, Federal Practice and Procedure, § 342, pp. 627–28 (1969). Because of a defendant's sixth amendment right to be tried in the district where the crime was allegedly committed, Rule 21, F.R.Cr.P., conditions a change of venue, *inter alia*, upon the defendant's request therefor. Absent the request, a change of venue may not be ordered, Parr v. United States, 351 U.S. 513, 523, 76 S.Ct. 912, 100 L.Ed. 1377 (1956) (Warren, C. J., dissenting). Although a change of venue under Rule 21 cannot be imposed on a defendant against his will, the availability of a change of venue as a corrective device undergirds the requirement that a defendant, who declines to request a change of venue but who seeks dismissal of an indictment against him because of allegedly prejudicial pretrial publicity, demonstrate the existence of actual prejudice far more convincingly than was done in the case at bar. A defendant who has unused means to protect his rights should not lightly be granted the extreme remedy of dismissal of the charges against him on less than a conclusive showing that the unused means would be ineffective.

Similarly, a continuance is another corrective device since it allows possible prejudice to fade away from the dimming of recollections. But there are decided limitations on its use stemming from a defendant's sixth amendment right to a speedy trial. Whether in a given case the granting of a continuance would infringe a defendant's right to a speedy trial can be determined only by a balancing process, a significant factor of which is the reason the continuance is needed. Barker v. Wingo, 407 U.S. 514, 530–531, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). If a defendant does not request a continuance, or acquiesce in the government's request therefor, the fact that the continuance is required because of the government's misconduct in disseminating pretrial prejudicial publicity is a factor weighing heavily against its grant, although not one which is conclusive. Geagan v. Gavin, 181 F.Supp. 466 (D.Mass.1960), aff'd 292 F.2d 244 (1 Cir. 1961). However, the existence of this remedy again undergirds the placing of a heavy burden of proving actual prejudice resulting from the publicity as a basis for dismissal of the charges against him on the part of a defendant who declines to request or join in a request for a reasonable continuance.

### III.

We disagree that the indictment should be dismissed because of irrelevant prejudicial and inflammatory information brought to the attention of the grand jury which indicted defendants. Our disagreement follows from our conclusion that the "nine deaths" and "fifty deaths" data was relevant.

The grand jury was investigating possible violations of the federal drug laws. Defendants were indicted, *inter alia*, for a violation of 21 U.S.C. § 352(j); whether it had been violated was certainly within the scope of the grand jury's investigation. That statute deems a drug "misbranded" if it is "dangerous to health when used in the dosage, or with the frequency or duration prescribed, recommended, or suggested in the labeling thereof." Evidence that use of Abbott's intravenous solutions may have been the cause of deaths which occurred manifestly would establish that the solutions were "dangerous to health." Especially is this so when it is remembered that the proceedings were before a grand jury where the standard of proof was one of probable cause and where strict rules of evidence, applicable at trial, were not fully operative. United States v. Calandra, 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974); Costello v. United States, 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397 (1956); Lawn v. United States, 355 U.S. 339, 78 S.Ct. 311, 2 L.Ed.2d 321 (1958); United States v. Johnson, 419 F.2d 56, 58 (4 Cir. 1970), cert. den., 397 U.S. 1010, 90 S.Ct. 1235, 25 L.Ed.2d 423 (1970). Thus, relevancy would not depend upon a conclusive showing, or a showing beyond a reasonable doubt, that the deaths did result from contamination of Abbott's intravenous solutions. The grand jury was at liberty to indict if it concluded that there was probable cause to believe the existence of the fact; the ultimate determination of the fact would be made at trial.

Defendants were also indicted under 21 U.S.C. § 331(a), which prohibits the introduction of any drug "that is adulterated or misbranded." While § 331(a) prescribes a crime of which scienter is not a necessary element, it does not follow that, in addition to Abbott, every employee of Abbott would have potential criminal liability; rather, only those who share in the responsibility of distributing adulterated or misbranded drugs in interstate commerce are potentially criminally liable. United States v. Dotterweich, 320 U.S. 277, 281, 284, 64 S.Ct. 134, 88 L.Ed. 48 (1943); United States v. Park, 499 F.2d 839 (4 Cir. 1974). "Responsibility" in turn depends upon knowledge, and if knowledge is established it depends further on the action or nonaction of the officer or employee after he has obtained knowledge. Thus, we think that

an inquiry to Mr. O'Donnell of whether he had knowledge from various sources of the charge that Abbott solutions caused deaths, as a prelude to the ultimate inquiry of what action he took with respect thereto, was relevant to the proceedings.

The district court found that the primary purpose of references to deaths before the grant jury was to influence the jurors and arouse their prejudice against defendants. We think this finding clearly erroneous. The record is devoid of direct evidence to support it. At best it is only an inference drawn by the district court from the premise that the references were irrelevant. But, as to the latter, we have concluded otherwise and hence the basis from which inference was drawn ceases to exist.

Reversed.