UNITED STATES of America, Plaintiff-Appellee,

v.

Rolf Wilhelm Otto ANTON, Defendant-Appellant.

No. 81–2435.

United States Court of Appeals, Seventh Circuit.

Argued March 2, 1982.

Decided May 3, 1982.*

---

\* Pursuant to Circuit Rule 16, this opinion has been circulated among all the judges of this court in regular active service inasmuch as it creates a conflict with the Ninth Circuit. A majority of the judges did not favor a hearing en banc. Judges Wilbur F. Pell, Jr., Jesse E. Eschbach, Richard A. Posner, and John Coffey were in favor of a hearing en banc.

Gregory J. Schlesinger, Chicago, Ill., for defendant-appellant.

Robert B. Breisblatt, Asst. U. S. Atty., Dan K. Webb and Robert Walter Tarun, U. S. Attys., Chicago, Ill., for plaintiff-appellee.

Before BAUER, CUDAHY, and POSNER, Circuit Judges.

BAUER, Circuit Judge.

This is an appeal from a judgment of conviction entered against the defendant, Rolf Wilhelm Otto Anton, for violating 8 U.S.C. § 1326, Reentry of Deported Alien. For the reasons explained below, we reverse that judgment.

The statute under which the defendant was charged provides:

Any alien who—

(1) has been arrested and deported or excluded and deported, and thereafter

(2) enters, attempts to enter, or is at any time found in, the United States, unless (A) prior to his reembarkation at a place outside the United States or his application for admission from foreign contiguous territory, the Attorney General has expressly consented to such alien's reapplying for admission; or (B) with respect to an alien previously excluded and deported, unless such alien shall establish that he was not required to obtain such advance consent under this chapter or any prior Act,

shall be guilty of a felony, and upon conviction thereof, be punished by imprisonment of not more than two years, or by a fine of not more than $1,000, or both.

At trial, the Government introduced evidence indicating: (1) that the defendant is an alien; (2) that he had previously been arrested and deported; (3) that he was subsequently found in the United States; and (4) that a review of the records of the Immigration and Naturalization Service re-

flected that the Attorney General had not given Anton permission to reapply for admission to the United States. The defendant introduced evidence indicating that he reasonably believed he had obtained the necessary permission prior to his reentry. Essentially, he testified that after his original deportation he had a series of dealings with officials in the American Consulate as well as contacts with the INS office in Chicago and with the office of the Attorney General; and, as a result of those events, he obtained a new visa with which he gained readmission to the United States through a normal INS checkpoint. The Government challenged the relevancy of that evidence, arguing that the only question was whether Anton had actually received the express consent of the Attorney General.[1]

At the close of testimony the district court adopted the following instruction:

> In order to sustain ... the offense charged in the indictment, the Government must prove each of three propositions beyond a reasonable doubt: First, that at the time alleged in the indictment the defendant was an alien. Second, that the defendant was arrested and deported from the United States to the Federal Republic of West Germany in pursuance of law on or about September 7, 1979. Third, that thereafter on or about October 16, 1980 the defendant was found unlawfully present in the United States in the Northern District of Illinois as charged.... In order to find that the defendant was unlawfully present in the United States, you would have to find from your consideration of all the evidence that the Government has proved beyond a reasonable doubt that before leaving from a place outside the United States to enter the United States, the defendant did not obtain the express consent of the Attorney General of the United States to reapply for admission to the

United States. *For that purpose you are instructed that you are not to take into consideration any evidence as to consent claimed by the defendant to have been obtained from any Government official who was not acting under the authority of the Attorney General, or any evidence as to consent claimed by the defendant to have been obtained after he had left a place outside the United States.*

(Transcript of Proceedings of 7/21/81 at 299–300 (emphasis added).) This in effect precluded the defendant from arguing his "reasonable belief" defense.

Subsequently the jury found the defendant guilty of the offense charged. After denying the defendant's motion for a new trial, the court entered judgment to that effect. This appeal follows.

The defendant asserts that the district court denied him a fair trial by instructing the jury that, in determining whether he was unlawfully in the United States, it could not consider evidence relating to his belief that he had the consent of the Attorney General to reenter. He contends that such a belief, if reasonable, is a viable defense to the charge under section 1326.

The district court refused to recognize the defense, which is essentially one of mistake, on the ground that the crime charged "requires no showing of intent." Because we agree that a mistake defense is possible only if there is some "mental state required to establish a material element of the crime" that the mistake can negate, *see* W. LaFave & A. Scott, *Criminal Law* 356 (1972), our first inquiry must be whether the premise that criminal intent plays no part in the crime charged is sound.

## I

■ On its face section 1326 does not mention intent. That omission, however, is not alone sufficient to establish that intent is irrelevant. *United States v. United*

---

1. The Government also challenged the reasonableness of the defendant's alleged belief pointing out, *inter alia*: (1) that during his dealings with the American Consulate, Anton lost his original passport which contained his cancelled visa; (2) that a letter he had allegedly received from the office of the Attorney General was left in Germany and not retrieved for trial; and (3) that on his new visa application Anton avoided answering whether he had ever had a visa invalidated.

*States Gypsum Co.*, 438 U.S. 422, 438, 98 S.Ct. 2864, 2874, 57 L.Ed.2d 854 (1978). When the terms of a statute are not clear and unequivocal, a reviewing court must construe the legislative intent of the enactment to resolve the ambiguity. *United States v. Balint*, 258 U.S. 250, 42 S.Ct. 301, 66 L.Ed. 604 (1922). The first step in that process is to consider the relevant legislative history. *Prussion v. United States*, 282 U.S. 675, 51 S.Ct. 223, 75 L.Ed. 610 (1931). In this case, that history is silent on the question at issue. *See* 1952 U.S.Code Cong. & Ad.News 1653. Thus it becomes necessary to turn to "principles derived from common law as well as precepts suggested by the American Law Institute [in the Model Penal Code]" for guidance. *United States v. Bailey*, 444 U.S. 394, 406, 100 S.Ct. 624, 62 L.Ed.2d 575 (1980).

In reaching its conclusion that section 1326 has no intent requirement, the district court did not independently construe the statute in light of such factors. Rather, it adopted the analysis set forth in *Pena-Cabanillas v. United States*, 394 F.2d 785 (9th Cir. 1968). Therefore, we must focus our discussion on that decision.[2]

### A

In *Pena-Cabanillas*, the Ninth Circuit upheld a trial court's refusal to admit a purported birth certificate of a defendant on the issue of intent under section 1326 on the ground that "specific intent . . . is not part of the statute." *Id.* at 790. Although the court couched its discussion in terms of "specific intent," it actually held that section 1326 has no criminal intent requirement and thus defines a strict-liability offense.[3]

The Ninth Circuit refused to read a criminal intent requirement into the statute for two reasons. First, it focused on the "nature and quality" of the legislation. *See Morissette v. United States*, 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288 (1952).[4] Characterizing the statute as "regulatory," the court concluded that it describes a "typical mala prohibita offense." *Pena-Cabanillas v. United States*, 394 F.2d at 788. Second, the court noted the absence of language indicating intent in section 1326. In contrast, it pointed to seven other sections of the same statute that proscribe "wilful" or "knowing" conduct. *Id.* at 789–90 n.4.[5] Applying the traditional rule of statutory construction: "where Congress has carefully employed a term in one place and excluded it in another, it should not be implied where excluded," the court concluded that "[i]t would be absurd . . . to think that Congress inadvertently left 'intent' out of Section 1326." *Id.* at 789, 790.

### B

Although we agree with the Ninth Circuit that common-law principles of statutory construction are the appropriate tools for ascertaining the legislative intent of this

---

**2.** The Ninth Circuit is the only appellate court that has decided the question of criminal intent under § 1326. Two other circuits have recognized the issue but not had occasion to resolve it. *United States v. DiSantillo*, 615 F.2d 128, 132 n.6 (3d Cir. 1980) (indicating that the question remains open); *United States v. Wong Kim Bo*, 472 F.2d 720 (5th Cir. 1972) (suggesting in *dictum* that the Ninth Circuit's statutory construction is correct).

**3.** The Ninth Circuit did find that the statute requires a showing of "general intent." *Id.* However, it used that term in reference to the voluntariness of the defendant's acts. Under currently accepted analysis, "voluntariness" is treated as part of the "criminal act" requirement. LaFave & Scott, *supra*, at 179–81. It is not relevant to the requirement of "criminal intent." *Cf. United States v. Bailey*, 444 U.S. at 403, 100 S.Ct. at 631.

**4.** In *Morissette*, the Supreme Court acknowledged that the "abandonment of the ingredient of intent" in certain cases is tied to the "peculiar nature and quality of the offense." Specifically, the Court "referred to '. . . a now familiar type of legislation whereby penalties serve as effective means of regulation,' and continued, 'such legislation dispenses with the conventional requirement for criminal conduct—awareness of some wrongdoing.'" *Id.* 342 U.S. at 259–60, 72 S.Ct. at 247–48 (citation omitted).

**5.** 8 U.S.C. §§ 1287, 1306(a), 1306(d), 1324, 1325(3), 1327, and 1328. The court also noted five other sections that have "no language concerning specific intent." 8 U.S.C. §§ 1306(b), 1306(c), 1321, 1322, and 1323.

statute, we cannot accept that court's conclusion that criminal intent is totally irrelevant under section 1326. Our disagreement is based on two grounds: (1) the reasons relied upon by the Ninth Circuit to support its conclusion that intent is irrelevant are inconclusive; and (2) competing common-law principles, overlooked by the Ninth Circuit, compel a retention of the traditional criminal intent requirement.

1. *Reasons Relied Upon by the Ninth Circuit*

*Nature and Quality of the Legislation*

In regard to the "nature and quality" of section 1326, the Ninth Circuit simply stated that the statute, being an exercise of the plenary congressional power to control immigration, is "regulatory" and thus "mala prohibita." The Supreme Court, however, has cautioned that reliance on "a simple process of classifying the statute involved as ... 'regulatory,'" is not a satisfactory basis for resolving the question of criminal intent. *United States v. Freed*, 401 U.S. 601, 612, 91 S.Ct. 1112, 1119, 28 L.Ed.2d 356 (1971) (Brennan, J., concurring). The problem with such an approach is apparent in this case. Although Congress has plenary power to "regulate" the flow of aliens into this country, the Ninth Circuit failed to explain how this regulation is analogous to the types of control that heretofore have grounded strict-liability offenses.

Violation of section 1326 is not a "public welfare offense" in the sense in which that term was originally used to describe "minor violations of laws regulating the sale of intoxicating liquor, impure or adulterated food, milk, drugs or narcotics, criminal nuisances, violations of traffic or motor-vehicle regulations, or of general police regulations passed for the safety, health, or well-being of the community and not in general involving moral delinquency." Sayre, *Public Wel-*

*fare Offenses*, 33 Colum.L.Rev. 55, 83 (1933). Rather, it is a felony. Yet the offense also does not parallel the narrow class of strict-liability crimes for which substantial penalties have been found to be justified. *See United States v. Dotterweich*, 320 U.S. 277, 280, 64 S.Ct. 134, 136, 88 L.Ed. 48 (1943) (shipping adulterated and misbranded drugs); *United States v. Freed, supra* (possession of unregistered highly dangerous offensive weapons); *United States v. Balint, supra* (selling narcotics). The key to such offenses is their potential harm. In these areas it is clear Congress has determined that, to prevent severe harm, it is best to have people act at their peril. Less severe restrictions are inadequate or unworkable.

Admittedly there is some harm to the "social order" when a previously deported alien reenters this country without the express consent of the Attorney General. It is not clear, however, how that harm rises to a level that justifies imposing a severe criminal sanction against one who reasonably but mistakenly reenters. That uncertainty is compounded by the fact that there is a non-penal alternative to remedy the same harm; namely, the person can be deported.[6] This further negates the imputation of a strict-liability purpose to section 1326. *Cf. United States v. United States Gypsum Co.*, 438 U.S. at 442, 98 S.Ct. at 2876.

The Ninth Circuit's characterization of this offense as "regulatory" or "mala prohibita" did not justify its finding that criminal intent is irrelevant; rather, the characterization simply restated the court's conclusion.

*Absence of Language Concerning Intent and Statutory Construction*

The second rationale offered by the Ninth Circuit for treating the crime defined in

---

**6.** Under 8 U.S.C. § 1251(a)(1), an alien who "at the time of entry was within one or more of the classes of aliens excludable by the law existing at the time of such entry" can be deported. One such excludable class consists of "[a]liens who have been arrested and deported ..., unless prior to their embarkation ... the Attorney General has consented to their applying or reapplying for admission." 8 U.S.C.

§ 1182(a)(17). Although on its face the language of this section is similar to that of § 1326, this is a *civil* provision. Considerations of "criminal intent" (and mistake) are not applicable in construing its meaning. Thus the only "arrested and deported" aliens who are not subject to further deportation are those who in fact have the consent of the Attorney General to apply or reapply for admission.

section 1326 as a strict-liability offense involved the absence of "specific intent" language in the section. As noted earlier, however, the mere omission of such language is not sufficient to justify dispensing with an intent requirement. In fact, the Third Circuit, analyzing another question under section 1326, has stated that although the section "does not use the word 'wilful' or any similar term, nonetheless it makes a violation of its provisions a felony and [therefore] we cannot assume that the omission of such a term as that referred to is of great import." *United States v. Bowles*, 331 F.2d 742, 750 n.14 (3d Cir. 1964). Thus the key to this portion of the Ninth Circuit's analysis was its reliance on the rule of statutory construction: "When Congress has carefully employed a term in one place and excluded it in another, it should not be implied where excluded." Because Congress expressly proscribed "wilful" or "knowing" conduct elsewhere but not in section 1326, the court concluded that specific intent is not part of that section. *Pena-Cabanillas v. United States*, 394 F.2d at 790.

Although we acknowledge that the maxim invoked by the court is an accepted canon of statutory construction, we also recognize that it "is only an aid to statutory construction, not a rigid rule of law." *Neuberger v. C.I.R.*, 311 U.S. 83, 88, 61 S.Ct. 97, 101, 85 L.Ed. 58 (1940). Closer scrutiny reveals that the application of the rule in this context is not conclusive.

■ The term "intent" is an "elastic" one which describes a variety of culpable states,

i.e., purpose, knowledge, recklessness, and negligence. *United States v. Bailey*, 444 U.S. at 403–04, 100 S.Ct. at 631. It is not clear that the failure to include the terms "wilful" or "knowing" necessarily precludes all considerations of intent.

■ Moreover, intent is "not a unitary concept, but may vary as to each element of a crime. . . ." *United States v. Freed*, 401 U.S. at 613, 91 S.Ct. at 1120 (Brennan, J., concurring). To support a section 1326 charge, the Government must prove: (1) that the accused is an alien; (2) that he previously was arrested and deported according to law; and (3) that he subsequently was found unlawfully in the United States.[7] *See Pena-Cabanillas v. United States*, 394 F.2d at 789. In this case we are concerned with the third material element of the offense. Focusing on that element, we must consider the situation in which a previously deported alien has no intent to reenter this country unlawfully (i.e., his conduct is not marked by purpose, knowledge, recklessness, or negligence), but he nevertheless gains readmission without the express consent of the Attorney General. In such a case the primary regulatory function of the statute—to deter unlawful reentry—is simply ineffective. Yet under the Ninth Circuit's statutory construction, such conduct comes within the purview of the statute. Based on several competing considerations outlined below, we do not believe that Congress intended to apply this penal statute in such a situation.[8]

### 2. Competing Common-Law Principles

■ Strict liability is generally inappropriate when the offense is punishable by

---

**7.** These three points track the instruction given by the district court. *See* page 3, *supra*.

**8.** We recognize that a similar "no-specific-deterrence" argument is not sufficient to preclude application of a criminal sanction against one who simply alleges that he did not know of the existence of a prohibition. However, the justifications for that rule: (1) avoidance of peculiar problems of proof, and (2) the overriding societal interest in encouraging men to know the law, *see* Hall and Seligman, *Mistake of Law and Mens Rea*, 8 U.Chi.L.Rev. 641 (1941), are

not dispositive of the case we describe. We do not deal with a question "so insoluble and interminable that 'the administration of justice would be arrested' if [it] had to be litigated." *Id.* at 647 (footnote omitted). *See* Part III, *infra*. Moreover, under our analysis we continue to charge persons with knowledge of the prohibition described in § 1326. The societal interest in encouraging men to know the law is respected. Our concern is for an accused whose conduct, lacking all criminal intent, is not inconsistent with that knowledge.

imprisonment or other severe sanctions. *United States v. United States Gypsum Co.*, 438 U.S. at 442 n.18, 98 S.Ct. at 2876; *United States v. Freed*, 401 U.S. at 613 n.4, 91 S.Ct. at 1120. (Brennan, J., concurring); *Morissette v. United States*, 342 U.S. at 256, 72 S.Ct. at 246. The rationale for this rule was aptly stated by Professor Sayre in his seminal article "Public Welfare Offenses":

> To inflict substantial punishment upon one ... who caused injury through reasonable mistake or pure accident ... would so outrage the feelings of the community as to nullify its own enforcement.

Sayre, *supra*, at 56. The Model Penal Code reaffirms this viewpoint. Model Penal Code § 2.05 (Proposed Official Draft 1962). Section 2.05 provides that *no* strict-liability offense should carry a sentence of imprisonment. This court has also recognized that severity of punishment is a significant factor to consider in evaluating the intent requirement underlying a criminal statute. *United States v. Inciso*, 292 F.2d 374 (7th Cir.), *cert. denied*, 368 U.S. 920, 82 S.Ct. 241, 7 L.Ed.2d 135 (1961) (Section 302(b) of the Labor Management Relations Act of 1947, 29 U.S.C. § 186(b) and (d)).

The offense in question is a felony, punishable by a maximum of two-years imprisonment. Yet nowhere in the *Pena-Cabanillas* opinion did the Ninth Circuit acknowledge the severity of the potential penalty. Certainly that is a critical factor in this inquiry.

In addition, " 'ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity.' " *United States v. Bass*, 404 U.S. 336, 347, 92 S.Ct. 515, 522, 30 L.Ed.2d 488 (1971); *United States v. Kraase*, 484 F.2d 549 (7th Cir. 1973). When a " 'choice has to be made between two readings of what Congress has made a crime, it is appropriate, before we choose the harshest alternative, to require that Congress should have spoken in language that is clear and definite.' " *United States v. Bass*, 404 U.S. at 347, 92 S.Ct. at 522 (citation omitted). This principle embodies the policy that " 'a fair warning should be given to the world in language that the

common world will understand, of what the law intends to do if a certain line is passed. To make the warning fair, so far as possible the line should be clear.' " *Id.* at 348, 92 S.Ct. at 522 (citation omitted).

■ Finally, " '[t]he existence of a *mens rea* is the rule of, rather than the exception to, the principles of Anglo-American criminal jurisprudence.' " *United States v. United States Gypsum Co.*, 438 U.S. at 436, 98 S.Ct. at 522 (citation omitted). Although traditional terminology "has been replaced by more sophisticated and less colorful characterizations of the mental state required to support criminality, *see* ALI, Model Penal Code, § 2.02 (Prop. Off. Draft 1962), intent generally remains an indispensable element of a criminal offense." *Id.* at 437, 98 S.Ct. at 522. A statute that allegedly eliminates that requirement should be read strictly and in a manner that does not lead to unreasonable or unjust results. *United States v. Ohio Barge Lines, Inc.*, 607 F.2d 624, 629 (3d Cir. 1979). Based on these well-established common-law principles, we cannot follow the Ninth Circuit's absolute bar to consideration of criminal intent under section 1326. Rather, we hold that there is some mental state requirement for the third material element of that section.

## II

Having concluded that proof of intent is relevant, we must now determine whether the specific defense alleged by the defendant, that he mistakenly believed that he actually had received the consent of the Attorney General to reenter the country, is viable.

The basic tenet in this area of criminal law is that "an honest mistake of fact negatives criminal intent," whereas "[a] mistake of law ... generally will not excuse the commission of an offense." *United States v. Barker*, 546 F.2d 940, 946 (D.C.Cir.1976). The defendant's claim, however, does not fall neatly into place in that scheme. His alleged mistake is not one of fact. He does not deny the events that did occur. Neither is the mistake one of law in the traditional sense, as he does not contend that he was

unaware of the prohibition. Rather, his alleged mistake concerns the legal effect of the events that preceded his return to the United States. Although this type of legal misperception also may be characterized as a mistake of law, it requires a separate analysis from the traditional mistake or ignorance of law claim described above. *United States v. Barker, supra*; LaFave & Scott, *supra*, at 356–57.

The traditional bar to a mistake of law defense is based on the policy that "all men should know and obey the law...." *United States v. Barker*, 546 F.2d at 947. With a collateral mistake of law, however, even if the defendant is charged with knowledge of the prohibition, his belief negatives criminal intent in much the same way as an honest mistake of fact. Thus in cases when application of the traditional rule would be "peculiarly unjust or counterproductive," courts have recognized a limited mistake of law defense, limited by the fact that the accused's mistake must be objectively reasonable under the circumstances presented. *Id.* at 947–48; *United States v. Moore*, 627 F.2d 830, 833 (7th Cir. 1980), *cert. denied*, 450 U.S. 916, 101 S.Ct. 1360, 67 L.Ed.2d 342 (1981).[9]

■■■ This case fits that pattern. If the defendant *reasonably* believed that he had the consent of the Attorney General to reenter the United States, it would certainly be unjust to subject him to this criminal sanction. Therefore, we find that a limited mistake of law defense is legally viable against a section 1326 charge. Further,

because the defendant presented some evidence to support that defense, he was entitled to develop his argument and to have the jury instructed on that theory. *Id.* at 832.[10]

### III

Our recognition of a "reasonable belief" defense in this context will not significantly affect the government's burden in a prosecution under this section. Normally the government will meet its burden by introducing evidence that the accused did not in fact have permission to reenter. Unless the defendant offers "some" evidence to the contrary, a jury is justified inferring from the government's initial showing that the defendant did not reasonably believe that he had such consent. *Cf. Pigee v. Israel*, 670 F.2d 690 (7th Cir. 1982). It is only in the atypical case in which the defendant offers evidence regarding his reasonable belief, that the government must contest his claim.

Further, as the present case demonstrates, even when an accused raises the defense, the impact on the trial is not inhibitive. In this case the district court did not preclude the defendant's "reasonable belief" defense until *after* evidence relating to the defense had already been admitted. It does not appear that the admission of that evidence was unduly burdensome. Had the district court recognized the defense, the only additional burden on the government would have been to contest the defendant's

---

**9.** In *Moore*, we dealt with a mistake of law defense asserted by a defendant charged with failing to file income tax returns. Moore argued that he believed he had filed adequate "returns." After noting that "wilfulness" is an element of the crime, we explained that even though as a matter of law what the defendant filed were not in fact "returns," it was proper to instruct the jury:

> The question is, did he reasonably believe that they were ... [I]t is Mr. Moore's theory that during the time which he was required to file these returns ... he did timely (file) what he then reasonably believed to be a proper income tax return ... and he did not, therefore, willfully fail to file a proper return. *Id.* at 833.

**10.** Despite the Government's suggestion to the contrary, "[w]here intent of the accused is an ingredient of the crime charged, its existence is a question of fact which must be submitted to the jury." *Morissette v. United States*, 342 U.S. at 274, 72 S.Ct. at 255.

> Inferences of fact as to intent depend upon the degree of credibility accorded to witnesses by the jury and may be drawn from the defendant's disbelief or belief in the legality of his act. For the purpose of enabling the jury to draw its inference of fact, a defendant is entitled to the right of informing the jury in respect to his belief.

*People v. Weiss*, 276 N.Y. 384, 12 N.E.2d 514 (1938).

claim during closing argument. This limited impact on a section 1326 prosecution is fair consideration for avoiding the possibility of an unjust felony conviction.

Accordingly, we reverse the judgment of the district court and remand for a new trial.

POSNER, Circuit Judge, dissenting.

I would affirm the defendant's conviction because I do not think that we have any warrant for reading a defense of reasonable mistake into 8 U.S.C. § 1326.

The statute, so far as is relevant to this case, makes it a felony for an alien who has been deported from the United States to be thereafter found in this country at any time unless the Attorney General has expressly consented, in advance, to the alien's reapplying for admission. I read this to mean that an alien who has been deported reenters this country at his peril. He had better be sure he has the express consent of the Attorney General because if he does not he is guilty of a felony.

I have difficulty understanding how Congress could have made its meaning any plainer. The statute does not simply make it a crime for a deported alien to return to this country illegally. It makes it a crime for a deported alien to be found "at any time" in this country "unless," before reembarking for the U. S., he has the "express" consent of the Attorney General. The structure of the statute and the choice of words seem designed to make the prima facie liability as broad as possible and the defense of consent as narrow as possible. And since the statute creates a crime unknown at common law, we cannot assume from Congress' silence that it meant to borrow the mental element from some earlier common law crime. Cf. *Morissette v. United States*, 342 U.S. 246, 262, 72 S.Ct. 240, 249, 96 L.Ed. 288 (1952). To be justified in rewriting the statute so that the words "unless ... the Attorney General has expressly consented" become "unless ... the alien reasonably believes that the Attorney General has expressly consented" requires more than a general distaste for strict liability criminal statutes.

Even if the statute is more susceptible of interpretation than I think, it is still necessary to ask whether the usual objections that are made to strict criminal liability probably would have persuaded the draftsmen of section 1326 to include a defense of reasonable mistake if their attention had been drawn to the point. Those objections are two. (See, e.g., Wasserstrom, *Strict Liability in the Criminal Law*, 12 Stan.L. Rev. 731 (1960).) One is that the moral authority of the criminal law is undermined when criminal punishment is visited upon an act committed with an innocent intent. This concern has little force when applied to a statute that is limited to previously deported aliens. Their previous sojourn in the U. S. was illegal; if they are again found to be here illegally, there is a powerful common-sense presumption of guilty intent. That this presumption is made conclusive by the statute is a harsh result, but not an unreasonable one, even though violators are subject to imprisonment. Cf. *United States v. Ayo-Gonzales*, 536 F.2d 652, 661 and n.22 (5th Cir. 1976).

The second objection to strict criminal liability is that fear of being punished for inadvertently straying across the line separating the lawful from the unlawful will cause people to steer too far clear of the forbidden zone—will deter socially desirable behavior along with the undesirable behavior that the statute was intended to deter. See, e.g., *United States v. United States Gypsum Co.*, 438 U.S. 422, 440–43, 98 S.Ct. 2864, 2875–76, 57 L.Ed.2d 584 (1978). But that objection also is weak in this case, again because the statute is limited to aliens who have already been deported at least once. True, not every deported alien is forever after an "undesirable"; the fact that deported aliens may be readmitted to the U. S. shows that this is too strong a characterization. But they are hardly a favored class of prospective entrants and it is therefore difficult to believe that the draftsmen of section 1326 would have been disturbed by the prospect that some previously deported aliens might be deterred

from reapplying for admission to the U. S. by fear they could be punished for an inadvertent violation.

There is an analogy here to statutory rape. A statute that does not allow a defense of reasonable mistake as to the girl's age will deter some men from having intercourse with young-looking girls who in fact are over the age of consent. Socially permitted activity is thereby deterred; but since there is no strongly felt social interest in encouraging the activity, overdeterrence is seen as a small price to pay for having a statute that is easier to enforce than it would be if a defense—inevitably rather porous—of reasonable mistake were allowed. Similarly, Congress would not I think have thought it a high price to pay for a strict prohibition against the illegal return of previously deported aliens that some deported aliens who would have gotten the Attorney General's express consent to reenter this country if they had applied for it would be discouraged from applying because of the consequences of making a mistake.

The evolution of the statute is instructive. The ancestor of section 1326 is a statute passed in 1918 which excluded from the U. S. "aliens who are anarchists," "aliens who believe in or advocate the overthrow by force or violence of the Government of the United States or of all forms of law," and several other classes of aliens similarly deemed subversive; and not only were they excluded, but any alien excluded or deported under the statute who thereafter attempted to enter the U. S. was made guilty of a felony punishable by up to five years' imprisonment. Act of Oct. 16, 1918, Pub.L.No. 221, 39 Stat. 1012. In 1929 the prohibition was extended to all previously deported aliens who tried to reenter the U. S.; however, for those not embraced by the 1918 act, the maximum penalty was reduced to two years because many of the aliens deported under other laws were considered less dangerous than those deported under the 1918 act. Act of March 4, 1929, Pub.L.No. 1018, § 1, 45 Stat. 1551, 8 U.S.C. § 180(a) (1946); see also S.Rep.No.1456, 70th Cong., 2d Sess. 1 (1929). Section 2 of the 1929 act made it a crime for an alien to obtain entry to the U. S. "by a willfully false or misleading representation or the willful concealment of a material fact." This provision suggests that the absence of any reference to state of mind in section 1 may not have been inadvertent. Congress was trying in section 1 to prevent deported aliens from returning, like yo-yos, from the countries to which they had been deported. "It frequently happens that aliens of the criminal and other classes who are deported under the general immigration law reenter the country unlawfully. As a matter of fact, in some instances such aliens have been deported four or five times, only to return as soon as possible to the United States in an unlawful manner." S.Rep.No. 1456, *supra*, at 1. A similar concern had been expressed by a sponsor of the 1918 act. See 56 Cong.Rec. 8109 (remarks of Rep. Burnett).

Section 1326 assumed its present form in 1952. Act of June 27, 1952, Pub.L.No.82–414, ch. 8, § 276, 66 Stat. 229. Section 1 of the 1929 act was extended to previously deported aliens who were found to be in the U. S. unlawfully even though their reentry had been lawful. In addition, the defense in the 1929 act for aliens receiving the Attorney General's "permission" to reapply for admission was tightened up by the substitution of "express consent." See H.Rep.No. 1365, 82d Cong., 2d Sess. 220–21 (1952), U.S.Code Cong. & Admin.News 1952, p. 1653.

In light of this history, the interpretation which will best carry out the legislative purpose is one that places the burden of mistake on the alien. Just as allowing a defense of reasonable mistake would make it much more difficult to achieve the objectives of the laws against statutory rape, so reading such a defense into section 1326 will make it much more difficult to achieve the legislative purpose of keeping illegal aliens out of this country. Anyone in any country with which we have diplomatic relations can walk into the nearest American consulate and get a visa allowing him to enter the U. S., as Anton, the defendant in

this case, did, and then testify plausibly at his criminal trial that he thought he had the Attorney General's express consent to reenter. (Plausibly but not, to me at least, persuasively: Anton either left blank (his testimony) or answered "no" (the government's) the question on the visa application form whether his previous American visa had been cancelled—as it had been, when he was deported.)

It is true, as my brethren note, that if criminal prosecution fails, the previously deported alien can be deported again; but having to deport the same illegal alien again and again is just the tedious cycle that Congress was trying in section 1326 to break. Any doubt on this score is dispelled by the legislative history of the 1929 act. "The fact that possible deportation is not a sufficient deterrent to discourage those who seek to gain entry through other than regular channels is demonstrated by the frequency with which [the Department of Labor] is compelled to resort to deportation proceedings for the same alien on several succeeding occasions.... [A]n alien deported at Government expense under the present procedure is not subject to any more difficulties or embarrassment than before the first successful attempt to enter the country unlawfully." S.Rep.No.1456, *supra*, at 2.

It is all very well to note as my brethren do that the draftsmen of the Model Penal Code and other progressive thinkers on criminal justice disfavor strict liability. But since no constitutional issue has been raised in this case, our only job is to think our way as best we can into the minds of the legislators who enacted section 1326 and its predecessors back to 1918. We have to guess whether they would have wanted to complicate the statute and reduce its deterrent effect by including a state of mind requirement that would protect deported aliens who by mistake failed to obtain the Attorney General's express consent to reenter this country. As I have already indicated, my guess is that they would not have. The origin of the statute during the wartime "Red Scare" that swept this country after the communist revolution in Rus-

sia in 1917, the extension of the statute in the 1920's, shortly after America abandoned its historic policy of essentially unrestricted immigration, from subversive aliens to all aliens, and its strengthening in 1952, during another xenophobic wartime period, make it doubtful that concern for the welfare of previously deported aliens has ever figured in the congressional thinking on this legislation. This in turn makes it unlikely that if Congress had thought about the issue raised in this case it would have wanted to compromise the effectiveness of the statute for the sake of a few illegal aliens who might be caught unwittingly in its toils.

The construction of the statute that I am advocating is the one that the Ninth Circuit adopted in *Pena-Cabanillas v. United States*, 394 F.2d 785 (9th Cir. 1968). Indeed, every decision until today, with one exception (reserving judgment on the question), has said or assumed that reasonable mistake is not a defense under section 1326. See *United States v. Wong Kim Bo*, 472 F.2d 720, 722 (5th Cir. 1972) (dictum); *United States v. Oris*, 598 F.2d 428, 430 (5th Cir. 1979) (assumed—issue not raised); *United States v. Trott*, 227 F.Supp. 448 (D.Md. 1964); *United States v. Mohammed*, 372 F.Supp. 1048 (S.D.N.Y.1973) (assumed); *United States v. Newton*, No. 81–727 (S.D. N.Y. Nov. 23, 1981), appeal pending, 2d Cir., No. 81–1495; but cf. *United States v. DiSantillo*, 615 F.2d 128, 132 n.6 (3d Cir. 1980) (reserving question). By rejecting the Ninth Circuit's decision in *Pena-Cabanillas* we create a conflict between circuits and thereby dump another case onto the crowded lap of the Supreme Court—and do so though the Ninth Circuit's decision makes even more sense today than when it was rendered fourteen years ago. We have greater experience today with the difficulty of stemming the flood of illegal immigration to this country; we should have greater understanding of the arguments for shifting the risk of mistake regarding a previously deported alien's right to reenter this country from harassed immigration officials to the deported aliens themselves—arguments that I believe Congress would

**1022**

have accepted if the issue had been raised when section 1326 or its predecessors were under consideration.

All this is not to say however that section 1326 is a strict liability statute in every respect. I doubt that if Anton had been kidnapped and transported by his kidnappers to the U. S. he would upon arrival here have been guilty of violating the statute. Cf. *United States v. White Fuel Corp.*, 498 F.2d 619, 624 (1st Cir. 1974). A defense of involuntary reentry would be narrow, and proof would not involve speculating on what a man knows or should know about obtaining the Attorney General's express consent to be readmitted to the U. S. But I earnestly submit that it is not a defense that the alien may have thought he had that consent when he did not.