In the
United States Court of Appeals
For the Seventh Circuit

No. 00-3632

United States of America,

Plaintiff-Appellee,

v.

Guillermo Carlos-Colmenares,

Defendant-Appellant.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 00 CR 328--James F. Holderman, Judge.

Argued April 24, 2001--Decided June 7, 2001


  Before Posner, Evans, and Williams, Circuit
Judges.

  Posner, Circuit Judge.  The defendant
pleaded guilty to the crime of having
been found in the United States, without
the express consent of the Attorney
General to be here, after having been
deported (in his case, twice deported). 8
U.S.C. sec. 1326(a)(2). Because he had
been deported after being convicted of an
aggravated felony, he was subject to a
maximum imprisonment of 20 years rather
than the normal 2 years, see sec.sec.
1326(a), (b)(2), and was in fact
sentenced to 80 months. His appeal, which
is based on United States v. Anton, 683
F.2d 1011 (7th Cir. 1982), complains that
the indictment failed to allege that he
had acted willfully or knowingly in
reentering the United States after his
deportation without permission. Anton
held, over the dissent of one member of
the panel, that a reasonable though
mistaken belief that the defendant had
the consent of the Attorney General to
reenter the country is a defense to a
prosecution under section 1326. This
implies, our defendant argues, that an
intent to reenter the country unlawfully
is an element of the crime; and there is
language in Anton that supports this
interpretation. See 683 F.2d at 1016. The
government disagrees with the
interpretation and in addition urges that
Anton be overruled. We agree that it

should be overruled, which moots the interpretive issue. Because we are overruling one of our decisions, we have circulated our opinion to the full court for a vote on whether to hear the case en banc. 7th Cir. R. 40(e). No judge in regular active service voted to hear the case en banc; Chief Judge Flaum did not participate in the consideration of the matter.

Of the eleven federal circuits besides the Seventh that have a criminal jurisdiction, all but the D.C. and Third Circuits have now spoken to the issue that divided our court in Anton. Every one of the other nine circuits has, in numerous decisions and without so much as a single dissent, rejected the position that we took in Anton. See United States v. Guzman-Ocampo, 236 F.3d 233, 237 (5th Cir. 2000); United States v. Gutierrez-Gonzalez, 184 F.3d 1160, 1165 (10th Cir. 1999); United States v. Ortegon-Uvalde, 179 F.3d 956, 959 (5th Cir. 1999); United States v. Martus, 138 F.3d 95 (2d Cir. 1998) (per curiam); United States v. Peralt-Reyes, 131 F.3d 956 (11th Cir. 1997) (per curiam); United States v. Torres-Echavarria, 129 F.3d 692, 697-98 (2d Cir. 1997); United States v. Gonzalez-Chavez, 122 F.3d 15 (8th Cir. 1997); United States v. Martinez-Morel, 118 F.3d 710, 713-14 (10th Cir. 1997); United States v. Henry, 111 F.3d 111 (11th Cir. 1997); United States v. Soto, 106 F.3d 1040 (1st Cir. 1997); United States v. Trevino-Martinez, 86 F.3d 65, 69 (5th Cir. 1996); United States v. Ortiz-Villegas, 49 F.3d 1435 (9th Cir. 1995); United States v. Leon-Leon, 35 F.3d 1428, 1432-33 (9th Cir. 1994); United States v. Ayala, 35 F.3d 423, 426 (9th Cir. 1994); United States v. Champegnie, 925 F.2d 54 (2d Cir. 1991) (per curiam); United States v. Espinoza-Leon, 873 F.2d 743 (4th Cir. 1989); United States v. Miranda-Enriquez, 842 F.2d 1211 (10th Cir. 1988); United States v. Hernandez, 693 F.2d 996, 1000 (10th Cir. 1982); United States v. Newton, 677 F.2d 16 (2d Cir. 1982) (per curiam); United States v. Hussein, 675 F.2d 114, 116 (6th Cir. 1982) (per curiam); Pena-Cabanillas v. United States, 394 F.2d 785, 789-90 (9th Cir. 1968). Most of these decisions postdate Anton and thus had the benefit of our reasoning, yet were unpersuaded by it. In the interest of promoting uniformity of federal law,

we have an obligation to reconsider our now isolated position. "When a number of other circuits reject a position that we have taken, and no other circuit accepts it, the interest in avoiding unnecessary intercircuit conflicts comes into play; and if we are asked to reexamine our position, we can hardly refuse." United States v. Hill, 48 F.3d 228, 232 (7th Cir. 1995); see also Critical Mass Energy Project v. NRC, 975 F.2d 871, 876 (D.C. Cir. 1992); cf. Colby v. J.C. Penney Co., 811 F.2d 1119, 1123 (7th Cir. 1987); International Society for Krishna Consciousness, Inc. v. Lee, 925 F.2d 576, 580 (2d Cir. 1991). That interest to one side, the unanimous rejection of our view by a significant cross-section of our colleagues around the country is a datum that can hardly fail to shake our confidence in the soundness of our decision.

Upon reexamination, we have concluded that our colleagues are right and that intent to reenter the country without the Attorney General's express consent is not an element of section 1326. Intent to reenter is an element, United States v. Quintana-Torres, 224 F.3d 1157 (9th Cir. 2000); United States v. Guzman-Ocampo, supra, 236 F.3d at 237; United States v. Martinez-Morel, supra, 118 F.3d at 713; Pena-Cabanillas v. United States, supra, 394 F.2d at 790; United States v. Anton, supra, 683 F.2d at 1022 (dissenting opinion)--it is hardly likely that Congress would have made it a crime to be transported involuntarily to the United States, say by an airplane hijacker--but not intent to reenter without the requisite permission. An alien who has been deported reenters this country at his peril. He had better make certain that he has the Attorney General's express consent to enter, because if he does not he is guilty of a felony.

Nothing in the statute's language or background suggests that an illegally returning deportee cannot be convicted unless he knew he lacked the Attorney General's express consent to reenter. On the contrary, the requirement that the Attorney General's consent be "express" is a warning that the alien not try to infer consent from ambiguous circumstances. The present defendant admitted signing a form, prior to his second deportation, that warned him that

"should you wish to return to the United States you must write this office [i.e., the INS] or the United States Consular Office nearest your residence abroad as to how to obtain permission to return after deportation" and that if he did not obtain the Attorney General's express consent to return he would be punished under section 1326. It is unclear to us what room is left for a defendant to argue plausibly that, while failing to obtain the Attorney General's consent, he had not intended to reenter the country in violation of the law.

The statute is limited to persons who have previously been deported from the United States. They are persons who were in this country illegally, and obviously knew it when they were deported. "[D]eportation itself is sufficient to impress upon the mind of the deportee that return is forbidden. No one in that position could innocently assume that the INS is a travel agency. The statute simply, and logically, makes the presumption of unlawful intent conclusive." United States v. Torres-Echavarria, supra, 129 F.3d at 698. The effect, much as in the case of statutory-rape laws that do not recognize even a reasonable mistake concerning the victim's age as a defense, see, e.g., Garnett v. State, 632 A.2d 797 (Md. 1993); State v. Silva, 491 P.2d 1216 (Haw. 1971) (per curiam), is to make deported aliens very cautious about reentering the United States without permission--in other words, to give them a strong incentive to steer well clear of the forbidden zone. The need for so strict a law is well illustrated by the present case, in which the alien was deported, reentered the United States, was deported a second time, and came back illegally a second time, all within a space of eight and a half months. Since anyone in any country with which we have diplomatic relations can walk into the nearest American consulate and get a visa allowing him to enter the United States as a visitor, the exclusion of deportees from returning to this country without the Attorney General's express consent would be porous if the deportee could escape the clutches of section 1326 by testifying plausibly that he had thought the receipt of the visa showed that he was entitled to come back. Concern that deported aliens were returning like yo-

yos from the countries to which they had been deported is a constant theme in the statutory history that culminated in section 1326, as explained in the dissenting opinion in Anton. See 683 F.2d at 1020-21. Related provisions of the immigration laws show that Congress knew very well how to make clear its intention that the alien be proved to have acted willfully. See 8 U.S.C. sec.sec. 1287, 1306(a), 1324(a)(1)(A), 1324c(a), 1325(a), 1327; see Pena-Cabanillas v. United States, supra, 394 F.2d at 789 n. 4. Recognizing in the teeth of the statute a defense of mistaken belief of consent to reenter would greatly complicate the administration of the national policy of excluding illegal--especially, previously deported--aliens.

The defendant points out that strict liability is a disfavored basis for criminal punishments, e.g., Staples v. United States, 511 U.S. 600, 606 (1994); Liparota v. United States, 471 U.S. 419, 426 (1985); Karlin v. Foust, 188 F.3d 446, 475 (7th Cir. 1999); United States v. Pasillas-Gaytan, 192 F.3d 864, 868 (9th Cir. 1999), and argues that a statute such as 8 U.S.C. sec. 1326, which, like a statutory-rape statute, allows a defendant to be convicted even if he made a reasonable mistake concerning an element of the crime, imposes a form of strict liability. The argument is imprecise. Liability would be strict if the returning alien could be punished even if he had been returned involuntarily. What is at issue is whether the government, in addition to having to prove that the alien was deported and knowingly returned and did not have the express consent of the Attorney General to return, must prove that he knew he didn't have that consent, or, alternatively, whether the alien may try to prove that he didn't know. Granted that there are moral and practical objections to visiting severe sanctions on what may be pure accident, the objections are compelling only with respect to traditional crimes as distinct from regulatory offenses. Morisette v. United States, 342 U.S. 246, 255-56 (1952); United States v. Wilson, 133 F.3d 251, 263 (4th Cir. 1997). By "traditional" crimes we mean ones that anyone might be accused of committing, such as murder or robbery or selling illegal substances or evading taxes.

People would feel insecure if they thought they could be sent to prison for accidental violations, such as failing to pay taxes they had no reason to know were due or killing in the reasonable belief that it was self-defense. "Regulatory" offenses are those that arise out of optional activities, such as having sex with very young women (who may be minors), or engaging in business activities that can cause great harm (such as the manufacture of foods or drugs)--or coming back to the United States after having been deported. The risk of violations of statutes that regulate optional activities can be eliminated simply by not engaging in the regulated activity. A person who has been deported from the United States can avoid any risk of violating 8 U.S.C. sec. 1326 just by not returning to the United States; he knows he is not welcome. If nevertheless he decides to return, he had better make sure he has the Attorney General's express consent.

Affirmed.