United States Court of Appeals
Fifth Circuit

**F I L E D**

**April 28, 2004**

Charles R. Fulbruge III
Clerk

**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

No. 03-20195

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

CIPRIANO MORALES-PALACIOS, also known as
Gildardo Morales-Palacios, also known as Gerardo
Morales-Palacios,

Defendant-Appellant.

Appeal from the United States District Court
for the Southern District of Texas

Before BENAVIDES, STEWART, and DENNIS, Circuit Judges.

CARL E. STEWART, Circuit Judge:

Cipriano Morales-Palacios ("Morales") appeals his conviction of attempted illegal reentry into

the United States following deportation in violation of 8 U.S.C. § 1326. Previously, in United States

v. Trevino-Martinez, we held that section 1326 does not require the government to prove specific

intent in the context of a completed reentry. 86 F.3d 65, 68-69 (5th Cir. 1996). In the current action,

Morales asserts that under section 1326 the offense of attempted illegal reentry — unlike completed

reentry — is a specific intent crime because it embodies the common law meaning of "attempt" Because section 1326 is a regulatory offense, rather than a traditional common law crime, we join the majority of circuits in concluding that specific intent is not an element of the crime of attempted illegal reentry into the United States. Overruling Morales's challenges centered on that point, we affirm the conviction.

## FACTUAL AND PROCEDURAL HISTORY

The following facts have been stipulated by both parties. On July 25, 1988, Morales, a Mexican citizen, applied to the Immigration and Naturalization Service ("INS") for legal status as a Special Agricultural Worker. The INS assigned to him the "A-file" numbered A93-107-012, and on December 1, 1990, granted Morales lawful permanent resident status in the United States.

From the period of October 6, 1994 to September 25, 1998, Morales was arrested and convicted, on three separate occasions, with transporting or selling a controlled substance in Los Angeles, California. On each occasion, INS officials subsequently found him in custody under the aliases of "Gerardo Morales," "Gildardo Morales-Palacios," "Gildardo Palacios," or "Gildardo Morales-Palacios". Based on the false aliases provided, on each occasion the INS assigned Morales the A-file numbered A72-903-803 and thereafter deported him to Mexico as an aggravated felon. After the first two deportations, Morales returned to the United States in an unknown manner and submitted an application for a replacement of his previously issued INS permanent resident alien card in the name of Cipriano Morales-Palacios.

Following the third deportation, on July 15, 2001, Morales returned to the United States at the port of entry in Hidalgo, Texas, and informed an INS official that he had an expired permanent resident status. Using the name Cipriano Morales-Palacios, Morales applied for an INS I-193 Form,

2

"waiver of passport and/or visa," paid the waiver fee, and was admitted as a permanent resident alien.

On July 24, 2001, Morales appeared at the Mexican Consulate in Houston, Texas, and applied for a Mexican passport also in the name of Cipriano Morales-Palacios. On August 8, 2001, Morales inquired about the status of his permanent resident alien card at an INS office in Houston. An INS official ran a computer check and determined that Morales had been issued A-file number A93-107-012. The computer check also revealed that Morales had been granted lawful permanent resident status in Florida in 1990, which had been renewed in 1995 in California. Based on the information Morales provided, an INS official incorrectly issued Morales a temporary stamp on his Mexican passport and visa which authorized his presence in the United States until August 7, 2002.

On November 4, 2001, and February 7, 2002, Morales arrived at the Houston Intercontinental Airport on a flight from Mexico City, Mexico. On April 19, 2002, Morales again arrived at the Houston Intercontinental Airport from Mexico City, Mexico, and he presented his expired Mexican passport and visa to INS officials containing the temporary INS stamp authorizing his presence in the United States until August 7, 2002. An INS official ran a computer check and determined that the name Cipriano Morales-Palacios was a possible alias used by a previously-deported aggravated felon. At that point, Morales was taken to a secondary inspection area, where a fingerprint check revealed that Morales had indeed been previously deported, under a false name, as an aggravated felon. Morales was arrested and taken into custody.

On June 12, 2002, a federal grand jury issued a one count indictment charging Morales with illegal reentry after deportation following the commitment of an aggravated felony in violation of 8 U.S.C. § 1326(a) and 8 U.S.C. § 1326(b)(2). On August 19, 2002, Morales was charged in a two

3

count, superseding indictment, with one count of illegal reentry and one count of attempted illegal reentry both in violation of section1326(a) and section 1326 (b)(2).

During the pretrial conference, Morales submitted proposed jury instructions on the elements of count two of the superseding indictment for attempted illegal reentry.[1] In response to the proposed jury instruction on the *mens rea* element of specific intent, the government filed a motion *in limine* to exclude any evidence of "good faith" and "mistake" on the part of Morales regarding whether he had the consent of the Attorney General to reenter. The district court found that section 1326 is a general intent statute and does not require a different standard for attempted reentry than is required for the underlying offense. Thus, the district court granted the government's motion *in limine*, but refused to submit Morales's proposed jury instruction.

The government proceeded to trial solely on the attempted illegal reentry count and abandoned the illegal reentry count. On September 25, 2002, the district court conducted a bench trial[2] and found Morales guilty of count two of the superseding indictment. In a judgment entered February 7, 2003, the district court sentenced Morales to an imprisonment term of 87 months, to be followed by 3 years supervised release. The district court imposed a $100 special assessment and did not order a fine. Morales timely filed a notice of appeal.

---

[1] The proposed instructions included the following *mens rea* element: "That, at the time alleged in the indictment, the defendant knowingly and voluntarily attempted to enter into the United States with the intent to do so knowing that he did not have the consent of the Attorney General . . . ." The proposed instruction also stated that: "If you find that the defendant did not obtain the consent of the Attorney General but have a reasonable doubt that he mistakenly believed that he had obtained such consent, then you must find that he did not intend to enter the United States unlawfully and further find the defendant 'not guilty.'"

[2] During pre-trial proceedings, both parties agreed, and the district court approved, that Morales would waive his right to a jury trial on the condition that if following a conviction by the district court, the court of appeals reversed and remanded, the waiver of the jury trial would not apply.

STANDARDS OF REVIEW

Morales challenges the jury instruction on the count of attempted illegal reentry under section 1326. He contends that the district court erred as a matter of law in concluding that specific intent is not an essential element of attempted illegal reentry. Although this court usually reviews a district court's failure to grant a requested jury instruction for abuse of discretion, we review *de novo* whether the jury instruction misstated an element of the statutory crime. United States v. Ho, 311 F.3d 589, 605 (5th Cir. 2002).

Morales also challenges the district court's grant of the government's motion *in limine* to exclude his testimony. Morales asserts that he was prejudiced by the district court's refusal to allow him to testify to his subjective belief that the Attorney General granted him permission to legally reenter the United States. We apply a deferential standard in reviewing a district court's evidentiary rulings, reversing only for an abuse of discretion. United States v. Booker, 334 F.3d 406, 411 (5th Cir. 2003). Even then, the error is not reversible unless the defendant was prejudiced. Id.

DISCUSSION

I.      **Intent Requirement for Attempted Illegal Reentry under section 1326**

This court has repeatedly held that when a previously deported alien illegally reenters or is found *within* the United States it is clear that specific intent is not a required element of section 1326. United States v. Berrios-Centeno, 250 F.3d 294, 298 (5th Cir.), *cert. denied*, 534 U.S. 928 (2001); United States v. Guzman-Ocampo, 236 F.3d 233, 237 (5th Cir. 2000); Trevino-Martinez, supra. We also have previously acknowledged a "clear distinction" between actual reentry and attempted reentry, the former requires physical presence and freedom from official restraint while the latter only requires a previously deported alien to approach a port of entry and make a false claim of citizenship

5

or non-resident alien status.  United States v. Cardenas-Alvarez, 987 F.2d 1129, 1132-33 (5th Cir. 1993).  The issue presently before this court, which we have not previously addressed, is the appropriate *mens rea* element for an attempted illegal reentry.  Morales asserts that the district court erred in denying his jury instruction requiring an intent to attempt to reenter the United States, without the Attorney General's express consent, as an element of section 1326.  We cannot agree.

In conducting statutory interpretation, we begin our inquiry with the plain language of the statute.  Staples v. United States, 511 U.S. 600, 605 (1994).  Here, the plain language of the statute provides little explicit guidance concerning the intent required for a violation.  Under section 1326, the language simply states that a previously deported alien who "enters, attempts to enter, or is at any time found in" the United States without the express consent of the Attorney General is prohibited.[3] Clearly Congress has not spelled out the mental state required; rather, the language of the statute is silent regarding an express *mens rea* requirement.  Nothing in the plain language of section 1326 suggests that a previously deported alien cannot be convicted unless he knew he lacked the Attorney

---

[3] 8 U.S.C. § 1326(a) provides in relevant part:

Any alien who —

(1) has been denied admission, excluded, deported, or removed or has departed the United States while an order of exclusion, deportation, or removal is outstanding, and thereafter

(2) enters, attempts to enter, or is at any time found in, the United States, unless

(A) prior to his reembarkation at a place outside the United States or his application for admission from foreign contiguous territory, the Attorney General has expressly consented to such alien's reapplying for admission; or (B) with respect to an alien previously denied admission and removed, unless such alien shall establish that he was not required to obtain such advance consent under this chapter or any prior Act,

shall be fined under Title 18, or imprisoned not more than 2 years, or both.

6

General's express consent to reenter. Quite the contrary, "the requirement that the Attorney General's consent be 'express' is a warning that the alien not try to infer consent from ambiguous circumstances." United States v. Carlos-Colmenares, 253 F.3d 276, 278 (7th Cir. 2001). Nonetheless, where a statute is silent as to intent, it becomes a question of legislative intent to be construed by the court. United States v. Balint, 258 U.S. 250, 252 (1922). We note that such explicit silence, however, does not necessarily suggest that Congress intended to dispense with a *mens rea* requirement. Staples, 511 U.S. at 605. In determining Congress's implied intent we may consider the statute in light of the background of common law principles. Id.

Morales puts forth the more substantial argument that insofar as an "attempt" has a settled common law meaning — as requiring a specific intent — we must assume that Congress meant to imply the same intent for an attempted illegal reentry. Morales contends that the common law meaning of "attempt" requires a specific intent to commit an attempted illegal reentry, even if the offense of illegal reentry itself does not require a specific intent.

Morales relies upon the lone position of United States v. Gracidas-Ulibarry, 231 F.3d 1188 (9th Cir. 2000) (en banc), a case which, like this one, involved an attempted illegal reentry for a previously deported Mexican citizen. In Gracidas-Ulibarry, the defendant contended at trial that he was asleep when he was driven to the port of entry, and thus never formed the specific intent to reenter the United States illegally. 231 F.3d at 1191. Accordingly, Gracidas requested, and the district court rejected, a jury instruction to allow the jury to find him guilty only if it concluded beyond a reasonable doubt that Gracidas "intended to enter the United States without the consent" of the Attorney General. Id. On appeal, the Ninth Circuit reversed the district court and held that the crime of attempted illegal reentry into the United States includes the common law element of

7

specific intent. Id. at 1190. The Ninth Circuit reasoned that "[u]nlike its use of the term 'enters' in § 1326 for the crime of illegal reentry, however, Congress' use of the term 'attempts' does not reflect silence as to intent but is consistent with a purpose to adopt [] the cluster of ideas that were attached to [the] borrowed word in the body of learning from which it was taken." Id. at 1195 (citing Morissette v. United States, 342 U.S. 246, 263 (1952) (emphasis in original)).

We are not persuaded by Morales's assertion, nor by the reasoning of Gracidas-Ulibarry, because imputing the common-law meaning of elements of crimes into statutes is compelling only with respect to traditional crimes as distinct from regulatory offenses. Carlos-Colmenares, 253 F.3d at 279. To avoid punishing ostensibly innocent conduct, in traditional offenses such as robbery, stealing, larceny, and its variants, we interpret statutes to codify the common law of crimes even if their enactments were silent on the subject. Carter v. United States, 530 U.S. 255, 266-67 (2000); Morissette, 342 U.S. at 251-52; see also United States v. X-Citement Video, Inc, 513 U.S. 64, 70 (1994) (stating that "the presumption in favor of scienter requires a court to read into a statute only that *mens rea* which is necessary to separate wrongful conduct from otherwise innocent conduct"). In such traditional offenses, we must assume that "[w]here Congress borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word . . . ." Carter, 530 U.S. at 264 (quoting Morissette, 342 U.S. at 263) (emphasis omitted). On the contrary, however, the Supreme Court has clearly instructed that the scope of the cannon on imputing common-law meaning does not sweep so broadly as to apply to the unique nature of regulatory crimes. Balint, 258 U.S. at 251-52 (stating that although the common law requires scienter as a necessary element of crimes, such a view is modified for prosecutions under regulatory statutes "the purpose of which would be obstructed by

8

such a requirement"); see also United States v. Wells, 519 U.S. 482, 492 n.10 (1997) (stating that when Congress describes an offense analogous to a common law crime the court rejects the "apparent view that any term that is an element of a common-law crime carries with it every other aspect of that common-law crime when the term is used in a statute").

The Supreme Court has long held that where the peculiar nature and quality of the offense requires an effective means of regulation, such legislation may dispense with the conventional requirement for criminal conduct, to-wit, awareness of some wrongdoing. Morissette, 342 U.S. at 259; see also United States v. Dotterweich, 320 U.S. 277, 281 (1943) (stating that a statute criminalizing the shipment of adulterated or misbranded drugs did not require knowledge that the items were misbranded or adulterated); United States v. Freed, 401 U.S. 601, (1971) (stating that a statute criminalizing possession of unregistered hand grenades did not require knowledge that the hand grenades were unregistered); but see Staples, 511 U.S. at 609 (stating that the destructive potential of guns does not require owners to dispense with proof of knowledge of the characteristics that make a weapon a "firearm"). The rationale for dispensing with a *mens rea* requirement with respect to elements of regulatory offenses was clearly enunciated in Freed, where the Court concluded that rejecting a specific intent requirement "may well be premised on the theory that one would hardly be surprised to learn that possession of hand grenades is not an innocent act." 401 U.S. at 609. As a result, we must exhibit extreme caution in allowing criminal defendants charged with regulatory crimes to utilize a mistake of fact defense where the mere illegal conduct may seriously threaten the community's health or safety and is sufficient to put individuals on notice that they stand "in responsible relation to a public danger." Staples, 511 U.S. at 611 (quoting, Dotterweich, 320 U.S. at 281).

9

There can be little doubt that section 1326 imposes criminal penalties on a class of persons whose mental state — ignorance of the consent of the Attorney General — would not make their attempted reentry entirely innocent. Section 1326 is not based on any common law crime, but is a *mala prohibita* regulatory offense limited to persons who have previously been deported into the United States. Pena-Cabanillas v. United States, 394 F.2d 785, 788 (1968) (stating that Congress has the plenary power "to exclude or to expel all aliens or any class of aliens, absolutely or upon certain conditions [as] an inherent and inalienable right which is essential to the safety, independence and welfare of every sovereign nation"). The Supreme Court instructed in Morissette, that the "purpose and obvious effect of doing away with the requirement of a guilty intent is to ease the prosecution's path to conviction." 324 U.S. at 263. We are not reluctant to impute that purpose to Congress where, as here, it would mean easing the path to convicting persons whose previous deportation alerts them to the probability of violating section 1326. As stated by Judge Posner of the Seventh Circuit, "[d]eportation itself is sufficient to impress upon the mind of the deportee that return is forbidden." Carlos-Colmenares, 253 F.23d at 278. In effect, under section 1326 a specific intent requirement is unnecessary, because the regulatory nature of the statute makes the presumption of unlawful intent conclusive. A previously deported alien has a unique set of knowledge that might not otherwise exist for defendants in traditional common law crimes; upon being deported, an alien has been given both oral and written notice that he or she cannot reenter without the express permission of the Attorney General. The act of attempting to reenter therefore speaks for itself.[4]

---

[4] We note that Morales also relies on United States v. Morales-Tovar, for the proposition that an attempted illegal reentry must include a specific intent element. 37 F. Supp. 2d 846, 851 (W.D. Tex. 1999) (finding that a conviction for attempt under § 1326 must include an element of specific intent to avoid the paradox of convicting persons who merely make inquiries at a port of entry). We do not find this precedent persuasive. In Morales-Tovar the defendant's conduct of merely asking questions

Here, a previously deported alien, such as Morales, would hardly be surprised to learn that by attempting to reenter the United States such behavior is far from being purely innocuous. The process of deportation sufficiently placed Morales on notice that he stood in reasonable relation to danger if he attempted to reenter the United States without government consent. Morales clearly intended, through the use of false aliases, to voluntarily attempt to reenter the United States illegally, thus it matters not that his mental state may have reasonably led him to believe he did so with the government's consent. Congress weighed the possible injustice of subjecting a previously deported alien to criminal liability without showing specific intent of consent from the Attorney General, against the evil of exposing the community to the dangers these individuals may pose, and concluded that the latter was the result preferably to be avoided. We find that when a previously deported alien, like Morales, voluntarily attempts to reenter the United States, he does so at his own peril.

In short, we note that two circuits other than the Ninth Circuit have found that a violation of an attempted illegal reentry criminalizes only a general intent. See United States v. Peralt-Reyes, 131 F.3df 956 (11th Cir. 1997); United States v. Reyes-Medina, 53 F.3d 327 (1st Cir. 1995). Today, we join the majority of circuits holding that for an attempted illegal reentry under section 1326 specific intent is not an element of the statute. We also note that in proving an attempted illegal reentry it is sufficient that the government demonstrates that a previously deported alien knowingly intended to reenter the United States — general intent with respect to the *actus reas* of the crime — rather than

---

was insufficient for an attempted reentry because as the district court found "there [was] no evidence that the defendant ever actually applied for admission to the United States." Id. at 849. In contrast, on the present facts there is no dispute that Morales voluntarily attempted to reenter the United States using a plethora of false aliases.

11

showing that such an alien had a reasonable but mistaken belief that he had the consent of the Attorney General to reenter the country.

## II.    Motion *in limine* to Exclude Subjective Belief

Morales also argues that the district court erred in granting the government's motion *in limine* to exclude evidence of Morales's subjective belief that he had the consent of the Attorney General to reenter the United States.  Because this argument vitally depends on the presumption that specific intent is an element of an attempted illegal reentry, based on the aforementioned, we find that the district court did not abuse its discretion in granting the government's motion *in limine*.

## III.    Conclusion

For the foregoing reasons, we AFFIRM the conviction of Morales for attempted illegal reentry into the United States.